Pennsylvania National Mutual Casualty Insurance Company v. Beach Mart, Inc. Mr. Shaw, are you ready to proceed? Yes, Your Honor. Good morning, police and court. I'm Stephen Shaw of the firm Womblevon Dickinson. In this appeal, defendant and appellant Beach Mart, Inc. I first want to acknowledge on behalf of our firm and our client our appreciation for the court's time and attention in hearing this appeal today. The issues of this appeal, while not simple or refreshingly straightforward, namely what allegations are necessary to invoke a prior publication exclusion that would permit an insurer to avoid its duty to the insured with respect to coverage of claims for advertising injury. Well, what are the alleged in the pleadings? Were the dates alleged as to when this conduct occurred so as to trigger the prior publication exclusion? Your Honor, there are several possible dates that are alleged. All of the exhibits that are attached... Don't you have to be a little more specific in these possible dates? Let me... Yes, Your Honor. Didn't the pleadings just say subsequent to 2005 and the coverage began in 2008? So how do you know from looking at the pleadings when the challenge conduct occurred? There are several relevant dates in the pleadings. All of the exhibits that are provided to counterclaims have dates in 2011, in October or November of 2011. Those are copies of the advertisements that were collected by L&L Wings. And actually, I'll offer a story here. I understand the court doesn't have the benefit of the seven years of discovery that we've had in the underlying action. L&L Wings initially sent a private investigator to the Outer Banks earlier in 2011 to document evidence of the alleged breaches and the wrongful advertising. Prior to filing its counterclaims, it sent, but after terminating the 2005 agreement, purporting to terminate, L&L sent its investigator back to the Outer Banks to redo all of the evidence, to take new pictures, to make new purchases, to establish that all of the advertising injury, all of the claims and harm that L&L Wings asserted occurred after the agreement had been terminated. So the exhibits to the counterclaims all have dates of 2011, with the exception of the Facebook page, which shows a post that occurred in 2010. The other relevant dates are the termination of the 2005 agreement, which L&L purported to complete in August of 2011 and was purportedly effective 60 days later. Prior to that, Beachmark had L&L's consent to do what it was doing, which is operate under the Super Wings trade name. The other relevant date that's in the pleadings, in the counterclaim, is the issuance of L&L's federal trademark registration in July of 2008. There are a lot of moving parts in this case here that are going to be followed up with even more moving parts. The next case is coming up on it. We're ready to go, Your Honor. The district court said the insurance company didn't have a duty to defend this action based upon the prior publication exclusion. Essentially that the coverage that was being sought for here, this had already existed for the coverage. It was substantially the same. So how do you address the district court's determination? Well, the district court first ignored several of the allegations that I've pointed out regarding the dates that happened after the inception of the policy, namely the issuance of the federal trademark registration, the termination of the consent agreement, and the exhibits, which have 2011 publication dates. The district court also made inferences that all of the conduct first inferred that based on L&L's allegation that the wrongful harm occurred sometime after December 31, 2005, which means during the term of the 2005 agreement. Once the 2005 agreement became effective, at some point then the harm occurred. You can't allege a breach of a contract until after the contract becomes effective. So the duty to defend, we all know, is broader than the coverage provisions of a policy. In other words, the duty to defend has been determined to be rather broad. Yes, Your Honor. And in this instance, there's no question that you had some trademark infringement interest before the coverage. The question is, is there additional things? And the only things that I can see you pointing out here would be the trade dress and the slogan allegations that you made within the complaint. And the question then is, does that make the complaint ambiguous, which we couldn't tell whether or not it's covered by the policy, and when it gets into that area of ambiguity, the duty to defend is triggered. I agree the duty to defend is triggered. The district court relied on the Hanover case that Penn National put forward. Is it because of the additional things that you allege in there on trade dress and slogan? It is both, Your Honor. It's because the inference the court took was impermissible in two ways. When you say both, tell me what you mean both. It is because of the additional non-trademark acts that are alleged and also the use of the WINGS or Super WINGS trademark sometime after December 31, 2005. The court took that allegation and inferred that the next day the bad conduct occurred and continued occurring from January 1, 2006 onward. But that's not alleged in the complaint, and that's distinctly different from an affirmative date of coverage trigger in the Hanover case. Now, with regard to the policies, is it your position there's no material distinction between the two policies that involve the coverage in this case? No, ma'am. There is a difference. The business owner's liability policy. What is the difference, and does it matter in this case? It does, and that's, Your Honor, why I said that it's both the trademark and the non-trademark acts. The business owner's liability policies exclude advertising injury arising from the use of a trademark. The umbrella liability policies do not exclude trademark use. So for the purpose of the business owner's liability policies, the duty to defend would be triggered by the non-trademark acts that constitute the alleged unfair competition and harm to L&L's business. The umbrella policies would cover both the non-trademark acts and also the use of the trademark, which was not excluded under that policy. And the issue, the inference that the district court made, aside from the date, was that the use of Wings and Super Wings continued unchanged by Beachmark for a period of 15 years, beginning in 1994 or 1995. And it's true that Beachmark has operated under a trade name. It runs all of its beachwear retail stores in the Outer Banks under the brand Super Wings. It's got a assumed name form filed with the county. It's been doing that for many years. That is the brand theme of the enterprise. During that time, 15-year period, there are, and we don't have this evidence from the district court because we never got into discovery in this case, there are a variety of advertisements that were published. Those advertisements refer to Wings' stores or Super Wings' stores in the Outer Banks. There's no evidence in the record and there's no evidence in the complaint that, the counterclaims that L&L filed of any of those advertisements except the ones that are attached as exhibits and dated 2011. So there's no way to conclude that the way that the Wings or Super Wings trademark was used was changed or unchanged, was substantially the same or varied in any way. And that's different from the Hanover case where there was only also an affirmative trigger date but examples of pre-trigger or pre-inception publications that the court was able to review. And we don't have that here. In both of the North Carolina cases that we cited, Harleysville and the other case, drawing a blank, the two cases, I'm sorry, Cubitt, Cubitt v. Mag Mutual, in both of those cases the conduct alleged in the complaint was continuous but ambiguous. And in Cubitt it was alleged that there was defamation that occurred prior to the policy trigger or the policy inception and that the defaming acts continued. From that the court concluded that it could not determine that the acts were all substantially similar and that the prior publication exclusion did not apply. How did Judge Boyle deal with a substantially similar issue? And in terms of the fact that we have to draw inferences broadly in your favor, how did he go off the track there? Your Honor, I believe he erred and he drew an inference that allowed him to find judgment on the prior publication exclusion. Right, but how did he deal with that in his opinion? His statement is fairly conclusory in the opinion. The reference is generally that because Beach Mart has been trading as Wings or Super Wings for 15 years, that all of its general advertising concepts were substantially the same. Okay, but that doesn't address the substantial similarity of the particular acts that triggered the first publication rule. No, Your Honor. And you're saying he totally failed to address that? He did not go into that detail. What he did was he invoked the test that the Hanover court put forward of a general advertising concept and used that to construe all of Beach Mart's market conduct, marketing, operation of its stores, as consistent with its general advertising concept of operating Super Wings stores. We don't dispute that Beach Mart has been operating its Super Wings stores for many years under that brand. What that inferential leap by Judge Boyle did was deviated from the North Carolina cases, which have not adopted such a standard. It also varies from the language of the policies itself, where the policy exclusion, the prior publication exclusion, refers to publishing advertisements or publishing material, not a general advertising theme or a business concept. So he made a couple different inferential leaps there. Well, he made a lot of factual findings, didn't he, on page 8 of his order, Joint Appendix 1080? And how did those play into the stage of the proceedings? I would argue that he did not draw those facts from the counterclaims that L&L, from the allegations of the counterclaims that L&L asserted, but rather made inferences from the counterclaims that were in favor of Penn National and rather not in favor of Beach Mart. In the complaint, L&L lumped, I think, all of the actions, the trade dress, the slogans, the Wings trade model. It didn't put them as separate causes of action. So should we treat that as just one cause of action that's based upon trade infringement? If you lump them all under a single theme, it would be more properly unfair competition in general, of which trademark infringement is a subset. The L&L did assert several enumerated different causes of actions, which incorporated by reference its blanket allegations about all of the alleged bad things that Beach Mart did to confuse people. The allegations about, for example, the trade dress and the building facade and the advertising slogan, are in the introductory allegations and are not in the enumerated causes of action, but then get reincorporated in the enumerated causes of action. I will point out that L&L did go to the trouble of stating all of those different acts as a basis for its claims of unfair competition, of which it asserted a variety, and included examples and exhibits of each of the different types of wrongful conduct that it felt it had been harmed by. It had an exhibit as to trade dress, an exhibit as to advertising, an exhibit for the website, an exhibit for the slogan. So in my view, and looking at the face of the complaint in the four corners, L&L saw those as discrete harmful acts. All right. Thank you, Mr. Shaw. Yes, Your Honor. Thank you. We'll hear from you again. Mr. Jones. May it please the Court, my name is Dwayne Jones. I'm with Hedrick, Gardner, McKenzie-Lewin, Garofalo in Charlotte, North Carolina, and I represent Pennsylvania National in this case. I see things a little bit more simply, simpler than Mr. Shaw. What we have here is in the counterclaims, L&L Weems, Alasdair Beachmore engaged in a common, clearly identifiable advertising objective. That's an important phrase. It's the phrase that Judge Boyle used and also refers back to the case you rely upon. So clearly identifiable advertising objective. And that objective consists of wrongful attempts by Beachmore to conceal the distinction between Beachmore and Weems in order to confuse customers in an effort to redirect the goodwill, reputation, and value of the Weems name for its own benefit. That's the allegation in the counterclaim. So we have to take that as true. It seems to me, though, Mr. Jones, what I'm concerned with in terms of how Judge Boyle handled this case is that he seemed to make a leap that everything was substantially the same. What is the basis? His order just doesn't articulate that. His order just kind of sweeps and says the allegedly offending material at issue substantially is the same since it first occurred. It says it again at the bottom of Joint Appendix 1080. And my concern is that he was ignoring the very broad duty to defend and the fact that substantial similarity is a factual matter. And he doesn't reference anything to support that conclusion. So how do we deal with that here? Well, I think that he, I guess the reason I started out the way I did is that, yes, this has been going on for a long period of time. And while Beachmore just stated that, you know, it's been sort of consensual or they did so with permission at times, they never really had permission. They had permission in 1995 pursuant to an oral agreement that they could use the Weems name. That agreement expired and they continued to use the Weems name. So what I'm saying is that that's key. You come up 2005, you have another agreement. And what I was saying about the thing is you look at all of the allegations and everything that they said that Beachmore was doing wrong, the trade dress, the misuse of the slogan, answering the telephone, hello, Weems, all that stuff is part of the same objective and that objective is simply we are Weems, Beachmore. Right, but the counterclaim doesn't contain any details, does it? Yes. Regarding the specific dates on which this specific, these incidences and the use of this occurred. And don't you have to have that to win on the prior publication? I guess I'd like to go with three points if I can. I do think that the counterclaims talk in terms of continual. It says that there's a continual violation of the 2005 agreement. Now, again, I'm not a linguist and we can sit out there and parse over what you actually have to have continual or what does the continual refer to. I think it refers to a continual breach of that 2005 agreement. So you're saying continual covers the substantially the same finding of the trial court. But that doesn't answer the timing. How does continual establish the timing aspect of it? That not only was it continual, you're saying it was continual as to time and continual as to substance? Yes. And that we can derive that from a reading of the pleadings? Yes. Because that's what Judge Boyle did, wasn't it? He said that both as to time and as to content. That's correct. And, yes, I would agree with Judge Boyle that substantially every single violation or allegation that's been alleged in the counterclaims is simply saying that Beachmark, through their advertisements, through their trade dress, through the construction that they put on the front of their stores, answering the phone, hello, Wings, has all been saying we are Wings. It's all part of that objective. They're not Wings. And they're trying to trade off of the goodwill and reputation of the Wings name. That absolutely has been continual in the sense that they've always put themselves out as Wings. They admit that. They admit that in their complaint. Then when you get to 2005 and they start doing super Wings, you can look at if you – one of the best examples of this is the picture that they put in their own brief of the two facades. If you look at those two facades, you scratch out – they tell you which one is Wings and which one is Beachmark. If you cover those up, you can't tell the difference between the stores. And that's my point. They have always put themselves out as Wings, not as anything separate. So then when you get into – Okay. There are a lot of different – how many different stores are there? I do not know. A number of them, right? Yeah. Okay. Did the pleadings address whether there was any difference in terms of the appearance of these stores? Does the pleading allege that the stores uniformly had the same appearance? I don't know that they allege that every single store is presented as the stores in that picture. Right. But don't you have to? No. In terms of the broad duty to defend. If some of the stores were different, then arguably they wouldn't be covered by the publication, right? No, Your Honor. I would disagree. I think that if you have one store – and I think they allege multiple stores. But if you have one store – I don't know that they allege all stores. But if you have one store that is putting itself out as Wings instead of Super Wings, then I think that's a violation. So again, they put themselves out at Wings when they weren't supposed to from somewhere around 96 until 2005. Then they came up with a separate agreement and they said, okay, we'll put ourselves out as Super Wings. But they never put themselves out as Super Wings at any distinguishable point. And that's why I directed your attention to that picture. I think one of those facades says Super Wings, but you can't tell it because it's so small. So they never put themselves out separately as Super Wings. They always still continue to put themselves out as Wings. Is it the fact that your company is, in fact, right now defending them subject to this particular action? You are now in the process of defending, but it is conditioned on this too, which allows you to go forward with this. I'm not 100 percent confident as if we have stopped. I believe that Penn National has stopped providing the defense. I believe that we at least provided the defense up until January of last year when they filed their summary judgment motions. So when we look at the prior publication in this case, I think it looks very clear. There was some trademark infringement going on at the time of the 2005 agreement. The issue in this case is whether that conduct is substantially the same when you add in trade dress and the slogan infringement, the latitude trade dress slogan infringement, you cover, you don't cover infringement, trademark infringement, as I understand the policy here. So Judge Boyle put them all together, which seemed to make sense until you start thinking about, well, one day they're going to have to talk about damages if it all comes out. And you could find damage for trade dress or a slogan infringement separate from the trade infringement here. And if that's so, why is that not ambiguity that would trigger the duty to defend? I apologize. I don't know that I completely understand your question. I don't know if I'll give you a satisfactory answer. Let's make it simple for you. If you got acts that are alleged to have occurred after the agreement and they would be covered but for the fact that you said they are substantially the same as those before it and the acts before it basically is trade infringement. But the acts after it are alleged to be slogan infringement and trade dress. So part of them would in fact be the basis for a damage claim. Then why does that not create ambiguity and duty to defend? Because I think that they are all the same thing. And when you look at the trade dress, again, that's why I was asking. Are they the same thing for purposes of determining damages? The answer would be no, right? I think that you can have a duty to defend and be excused from the duty to defend. And if at some point in time there were damages. But my question has to do with in terms of the cause of actions here. And I understand they're all lumped together. But when you break it down, someday if they prevail, some judge is going to have to say damages. And when you come to damages, there's different damages for trade infringement than slogan infringement than would be for trade dress. And given that differential, then why would we not say it's not substantially the same? Because I think that when you look at the street surfing case, which is Hanover, the Urban Outfitters case that Judge Bull primarily relied upon. When you look to see what is the duty to defend, you look at the analysis is to focus on the alleged wrongful acts manifested in the publications. And that's what I'm going back to and that's what I'm arguing and that is my argument. These publications all were wrongful and they all said the same thing. They all said we are wings. I cannot forecast up to Judge Wendrick's point as to why the damages would be different. I'm trying to understand this Urban. You're talking about the Third Circuit case. That's correct. That's where you have the Navajo Indian. Yes, sir. That's a different type of case than what you've got here. Well, I think that when you take Hanover and you go back to the street surfing, I don't understand why do you say it's different? Because I look at Kubit relies upon Ringler, a California State case. And that's what gives rise to the street surfing case, the Ninth Circuit case. And then the street surfing case gives rise to the Hanover case. And all of those things talk in terms, or excuse me, the street surfing and the Hanover case talk in terms of advertising injuries and when the duty to defend is triggered and when the duty to defend, you are then excluded from the duty to defend based upon advertising injuries. In the Outfitters case, it looks like the court looked at a specific date, March 16th, and said all of the actions occurred before that date. That's not exactly what's going on here. You've got at least some, maybe a lot of the trade infringement happening before 2005, but there are allegations of trade dress and slogan infringement beyond that. I think that they are all. However, the difference I was saying is from the Outfitters case to this case, Third Circuit case, which is not binding on us, but certainly good persuasive. These cases, the Kubit case, I guess is the case that's binding on you in the sense that it's the North Carolina case. The Kubit case adopts the similar versus substantial similar case from Ringler. And so then the other two cases are just further explanations of Ringler. So I think the Kubit case is, I use those other two cases as, the Kubit is very sparse as far as how it actually explains how you apply this test. And again, the other two cases just give deeper insight into how you apply the test. Kubit is, I served on the North Carolina Court of Appeals. Every time I see a case like that, I go back to see what's out on the roads. But that was 2011, so that didn't happen. But, you know, when we look at, to determine state law, there's been some serious question as to, well, to what extent do we look at state court of appeals cases as opposed to the court final result? And there's a lot of back and forth on that. And Kubit is where you're going on it. I'm not sure that's the case you're hanging on, especially given the fact I didn't write it. Right. I did about two weeks. And I only mean that in jest, of course. No, well, in jest, you wrote a case in the early 90s on 9788 fees and workers' compensation. If we have a chance, I'd like to talk to you about that one because I had some issues with that two weeks ago. Trust me, I wrote thousands of them. Anyway, you know, in a sense, I think you're correct. One of the problems with this case, and I think even when you look at street surfing and urban outfitters, there aren't a lot of case law anywhere on this. And certainly in North Carolina, this specific issue has not been addressed by our Supreme Court. It has been addressed by the Court of Appeals. And they relied upon Ringler. I am asking you to follow the reasoning since Kubit relied upon Ringler for the test, and then we do have explanations of how you apply Ringler. You're right, you're not bound by any of that stuff. But that's what I'm asking. But even Kubit says, I mean, when you look at what the case actually said, it says, only if it's not even arguably covered by the policy. And the question here, is it arguably, we're not saying it's covered, but it's arguably covered by the policy, which will trigger a duty to defend. So if you allege conduct that's within the period of coverage, that is different. I would say trade dress and slogan infringement is different from trade infringement, I mean, arguably. Then why does that not trigger the duty? Well, I think that Kubit, Judge Geer, ultimately the holding was, I don't have enough information about what happened after to tell if it was substantially similar to what happened before. So that's why she said you don't get out of the duty to defend. I would say, again, as I've been trying to explain, that here we know what happened afterwards, we know what happened before the policy period, and I'm telling you it's all the same stuff. It is simply, you cannot look at, if the allegations are, hey, Beachmart, all you've been doing all this time is setting yourself out as wings, sometimes with permission, but then you've broken that permission, at least on two occasions, in 1995 and 2005. Hey, we are wings, we are wings, that's wrong. That's what they've been saying with the store signs. So when you get to the trade dress, again, you look at the two stores, you look at that picture, you can't tell the difference. So they've achieved their goal of confusing customers. Okay, but then you have the issue of the number of stores again. You have 12 stores and four affiliated stores with Beachmart. Judge Keene, I don't understand, and correct me if I'm wrong, this is when I lose the case, it's when I lose the case. I would think that if you had four stores still putting themselves out as wings, not showing any distinction, that that still is a wrongful act of the same source of what we're talking about. And even if you had eight stores that said, hello, wings, and the other store just said, hello, I don't understand the difference. I think that there's still violations. You're saying that there would be no duty to defend if any one of those stores was in violation. Because I think that that continues the same publication, that this publication occurred before the policy period. Right, but that would be with regard to that one store. But you're saying that even if 11 of the 12 stores, there were no problems whatsoever, that wouldn't encompass conduct that entitled to them to protection? In other words, if they hewed exactly what they were supposed to do, from your perspective, with regard to 11 of 12 stores, wouldn't matter that lose their right to a defense because of one infraction with regard to that one store? I don't know the answer. I would say that, again, when you look at the wrongful acts and the continuous publications, that, yes, I would agree that if you only had three stores doing it and you had nine that weren't, that there's still a continual violation of the wrongful act. There's still a wrongful publication that's been put out there, and it would be continuous. However, I think if you look at the complaint, if you look at the But see, that would go to damages, though, wouldn't it? If it was only going to a certain number of stores that were violating, and then other stores were not violating, you'd have a damages issue, wouldn't you, with regard to how broad were the damages? Your Honor, I still think under the cases that the duty to defend, you would be excused from the duty to defend based upon the policy language. The other point that I want to make is I don't think the counterclaims say that, and I think the counterclaims, even Beechmark has said, we have always put ourselves out as wings or super wings. That's their admission. We've alleged it as well, but they've admitted we've always been wings. And then at some point in time, we were super wings. But the allegation and the complaints are when you went and used super wings, you didn't really use super wings. You scratched it down real low, and you still stuck with wings. So in answer to your question, that's what their business is. That's what all the stores are. I think that you are free under Hawley's bill to look at what the complaint says. You can't sit there and insert things that aren't there into the counterclaims. Now, when you say look at what the complaint says, you're talking about the counterclaim, aren't you? Yes, ma'am. That's correct. But I think that Hawley's bill or Waste Management uses pleadings, so I do think that you can look back at their admissions in the complaint that the counterclaims were based upon. And I think it's clear. So you're saying we can go beyond the pleadings against Beechmark? What's your basis for that? Not to go beyond the pleadings. I would say that the complaint is a pleading, and that complaint. Right. You're saying we can go beyond the counterclaim in terms of deciding coverage? Yes. Hawley's bill or, excuse me, Waste Management refers to pleadings. And so I think that you could look at. What were they talking about, though, when they were referring to pleadings? I've got the case here in front of me. If you could help me, direct me to where. What I know is that Waste Management mentions the word pleadings, and I don't have the slide with me right now, and I have 39 seconds. Okay. So I'll stand on the. Thank you, Cameron, again. Even if you go to the counterclaims, they have alleged that it's always been put out as wings, that that's how they operate. And the dates would be the same as to each of the 12 stores. What if one of the 12 stores didn't come into existence until after the coverage period? When that store came in, it was only operating as wings. It's the same publication that you had prior to the publishing period, policy period. So then it would all get back to the substantially dissimilar. Everything in here is substantially similar. That's my point. I think it's in my brief, and I'm out of time. I appreciate it. Before you do, let me ask one question on that. If the allegation is such as what you say it is, that it's substantially the same in terms of wings being represented as both before the coverage, what if the evidence further showed that during the coverage period there was this slogan, infringement, where you had this all you need for the beach as opposed to all you need, and that was during the period. Could the court say, well, there's not enough to show the trade infringement, but there's enough to show this slogan, infringement? In other words, could they recover just on that alone? I think it would still be excluded under the policy, and there would not be a duty to defend, and I would rely upon Ringler. But it wouldn't be excluded as a slogan infringement. I mean, that's covered, right? It's the same publication. I got it, but slogan infringement is covered. Right? One more time. Slogan infringement is covered under your policy. You're going to have to read my brief on that. That's a misstatement of what the policy says. My argument is the prior publication applies to any publication. They do go back and they try to get an exception to the other exclusion. Let me work with that just to say hypothetically. If it's covered, slogan infringement. And if they only allege slogan infringement that's covered, and could they recover on that alone without showing the trade infringement before the coverage? That's a hypothetical. We're dealing with duty to defend right now. We're talking about the coverage. Go ahead. Okay. You know, I'm trying to rewrite the policy in my head to fit your hypothetical, and so I'm struggling doing that. I know I'm way over my time. I'm going to do my best to answer this question. I think if you had the exception to the exclusion that brings in slogan and you put that exception to the prior publication exclusion, I'm out of this court anyway. I can't, you know. Then the prior publication exclusion is accepted for slogan. So my point is the prior publication is encompassing. If you read the policy, that's exclusion P. The only time slogan comes back in is as an exception to the exclusion Q. Now I sound like a mathematician. You're good. And to finally answer your question on the slogan is I would rely upon Ringler that says the publication before and the publication after does not have to be literal. The two variations of the slogan to me are the same slogan, and once again they are saying, hey, consumers, we are wings. So I'm way over my time. I really appreciate you letting me answer your question. Thank you. Thank you. I'll start where we left off in the last line of questioning there. I do think it's important to bring the court's attention to the actual text of the prior publication exclusion, which applies to oral or written publication of material. And I really have a hard time connecting that to the common advertising objective that Penn Nationalist put forth based on the Hanover case incorporating the street surfing case. And, in fact, the Kubit case did not adopt a common advertising objective. Now in that case the issue was defamation or slander, but the allegations of the complaint were just that they made slanderous statements before the policy inception and continued to make slanderous statements. And based on that, the court concluded that it could not determine that there was a substantial similarity because it didn't know what the statements were. And instead of inferring against the insured, the court in that case inferred in favor of the insured and said they're probably different and the prior publication exclusion doesn't apply. And you're saying in this case that Judge Boyle gave Penn National the benefit of the inferences. I am saying that, Your Honor. Another, if I can just add a little bit of color to some of the earlier questioning, as to the number of stores, Beachmart started off with two stores and expanded to 12 at the time the complaint was filed and then 14 two years later. So the number of stores, their locations ranging from Corolla down to Hatters, changed throughout the course of the period. New stores were opened. And the real point of that is none of those facts are in the record on a motion under 12C. Those facts are not in the counterclaims. And the court didn't have any ability to really adjudicate the issue of what changed and what did not change because L&L did not make allegations that allowed it to adjudicate that issue. Another minor point of correction is while the business owner liability policies do exclude trademark infringement, the umbrella liability policies do not exclude trademark infringement. So the substantial similarity inference has to be made both as to the trademark use, so the use of Super Wings, and also as to the non-trademark use, whether that was substantially similar throughout the entire history of Beachmart's operation. The point that I take from the Kubik case is that it looked at allegations where conduct was alleged to be continual. And it took those on face value, but it did not infer that the conduct was unchanging and that those are two different issues. And Beachmart's continuous operation of its business under a brand concept, which originated as Wings back in the early 90s and transitioned to Super Wings in 2006, does not create an unchanging landscape of advertisements, which is what the publication exclusion applies to is material that's published. And I think that there's a distinction there between the general brand concept of the enterprise on one hand and the actual advertising conduct that triggers the advertising entry. I'll also note that LL's counterclaim did not pursue any claims going back to 1995 or any claims prior to the 2005 agreement, nor could it have. That information, in my view, is alleged for background context, but none of the claims that LL asserted, despite his allegations, relate to the pre-2005 conduct. Rather, they all occurred subsequent to December 31st, 2005. Your Honor, that concludes my closing remarks, and I'd appreciate the Court's attention to this. And we ask that the Court reverse the decision of Judge Boyle and remand it and reinstate the counterclaims that Beachmart has asserted against Penn National, which were dismissed as a result of the substantive ruling under 12C. Okay. Thank you, Mr. Shaw. We'll come down and create counsel before we call our next case. Thank you.
judges: Barbara Milano Keenan, James A. Wynn Jr., Henry F. Floyd